# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 16, 2013 Session

## JANICE HARTLINE v. ROBERT STEPHEN HARTLINE

**Appeal from the Chancery Court for Bradley County**
**No. 2011-CV-137      Jerri S. Bryant, Chancellor**

_____

**No. E2012-02593-COA-R3-CV-FILED-JANUARY 13, 2014**

_____

In this domestic relations action, the trial court granted Wife a divorce on fault-based grounds against Husband and awarded her alimony *in futuro* in the amount of $3,800.00 monthly, health insurance costs, and attorney's fees. Husband appeals the trial court's awards of alimony and attorney's fees, as well as the court's valuation of his dental practice and division of marital assets. Wife raises a threshold issue of whether the trial court erred by granting a Tennessee Rule of Civil Procedure 60.02 motion after the time had elapsed to file a notice of appeal. We affirm the grant of the Rule 60.02 motion. We reverse the valuation of the husband's dental practice. We remand to the trial court for revaluation of the dental practice without consideration of professional goodwill, adjustment of the equitable division of marital assets based on revaluation of the dental practice, and clarification of the amount of attorney's fees awarded to Wife in the trial court. We affirm the judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Philip M. Jacobs, Cleveland, Tennessee, for the appellant, Robert Stephen Hartline.

Jillyn M. O'Shaughnessy, Chattanooga, Tennessee, for the appellee, Janice Hartline.

# OPINION

## I. Factual and Procedural Background

The parties were married on December 31, 1986. They had been married twenty-five years upon entry of the final judgment, at which time Husband was sixty-three years old and Wife was fifty-one. Both had been married previously, and each brought one minor child into the marriage. Wife's son from her first marriage, John Hogan, was five years of age when the parties married. Husband's son from his first marriage, Steve Hartline, Jr., was also a minor at the time of the parties' marriage and lived primarily with his biological mother. He contemporaneously spent co-parenting time with the parties. During this marriage was born one son, Jake Hartline, who was nineteen and enrolled in college at the time of trial.

Husband is a dentist who had operated a solo practice for more than thirty years in Cleveland, Tennessee. The parties met in 1982 when Wife began working for Husband as a dental assistant. Following their marriage in 1986, Wife continued to work for Husband as a dental assistant and office manager. As she testified, she stayed home for a few weeks when Jake was born in September 1992 but returned to work sooner than she desired because Husband's substitute assistant had left the practice. Wife continued to work in Husband's practice through approximately 2002.

Both parties identified a change in their marriage during the years of 1992 to 1993 when Jake was born. At that time, they also built a new dental office on real property purchased for the practice. They devoted long hours in establishing the practice at this new location. Wife alleged that Husband began to curse and belittle her at home and the office, and that Husband physically abused her from 1999 to 2002. She admitted that when Husband cursed at her, she would sometimes use profanity in response.

Testimony from Wife's son, John Hogan, and Wife's sister, Gale Underwood, corroborated that Wife was sometimes physically bruised and became depressed and despondent during the years of 1999 through 2002. Wife's other sister, Mary Christy Lipscomb, testified that she frequently witnessed deep purple contusions and fading yellow bruises with swelling on Wife's face, arms, and legs during this time frame. Ms. Lipscomb stated that before Jake was born, Wife was witty, funny, and full of life and energy. She added, however, that once the abuse began, Wife became very introverted and "somewhat of a hermit." Both Ms. Lipscomb and Ms. Underwood were employed by Husband at the dental practice, Ms. Lipscomb part-time from 1993 through 1996, and Ms. Underwood full-time from 1986 through 2003.

Husband admitted to bruising Wife's face at the dental office in an incident occurring on or about Memorial Day 1999. Ms. Underwood testified regarding this event that Wife had inhaled nitrous oxide ("nitrous") at the dental office and that Husband left her alone. Ms. Underwood became concerned, calling Wife's parents. According to Ms. Underwood, Husband returned about the time Wife's parents arrived, and he disconnected the nitrous. Husband testified that he became frustrated with Wife when he was trying to remove her from the nitrous and that he bruised her by taking her cheeks in his hands and shaking her. Immediately after this incident, Ms. Underwood remembered Wife appearing where Ms. Underwood and her parents were and saying to Husband, "You hurt me, you hurt me, I'm leaving." According to Ms. Underwood, Wife departed and was located by her family days later at a hotel. There they found her face to be "very swollen and bruised." Ms. Underwood stated that Wife did not work in the office much following this incident.

Wife also alleged that Husband was involved in an inappropriate relationship with an employee, S.W., whom he hired as a dental assistant in 1996. Wife stopped working at the dental practice in 2002 because she felt excluded by an environment in which Husband cursed her in front of other employees and behaved flirtatiously with S.W. Wife described an incident in which she observed S.W. putting on one of Husband's scrub tops while leaving an examination room where S.W. had been alone with Husband. Ms. Underwood testified that she observed the flirtatious relationship between Husband and S.W. According to Ms. Underwood, Husband treated S.W. differently than he did other employees and often whispered, giggled, and talked with her in private.

Ms. Lipscomb also described Husband's behavior toward S.W. at the dental office as inappropriate. She stated that he called S.W. "baby doll" and similar names while treating Wife progressively worse, shouting at Wife and demeaning her, sometimes in the presence of patients. Ms. Lipscomb described entering a back room at the dental office on one occasion to retrieve certain files and finding Husband and S.W. standing face to face, very close, and giggling. She also testified that during one day near Christmas 1995, she observed Husband suggesting a "nitrous party" at the office and indicating he would place one mask on Wife and another on S.W.

Husband denied having an inappropriate relationship with any of his staff members. He also denied permitting "nitrous parties" or using nitrous oxide for recreational purposes. He admitted to engaging in sexual relations with prostitutes on two occasions. He testified during deposition that he had kissed women other than Wife during the marriage; at trial, he denied having kissed any women other than Wife and the two prostitutes during the marriage. He admitted also to corresponding with women through online chat rooms, sending and receiving messages of a sexual nature. Evidence of such correspondence was presented during trial.

Conversely, Husband alleged that the parties' relationship began to deteriorate in 1996 when Wife developed an inappropriate relationship with a man, G.C., who had been a patient of the practice. G.C. testified that he and Wife engaged in an extramarital affair for approximately ten years and traveled to Gatlinburg on one overnight trip together. Wife admitted to a close friendship with G.C. and to traveling to Gatlinburg with him, but she denied that the relationship with G.C. was sexual in nature. Husband testified that he confronted Wife regarding G.C. in 2001 and that Wife disregarded his discomfort with the relationship. It is not disputed that the intimate relationship between the parties essentially ended in 1996.

Husband further alleged that Wife virtually abandoned the marriage at the time she left the practice in 2002. Wife acknowledged that at that time, she began to remain out of Husband's presence as much as possible. To this end, she would pick up Jake from school and stay with him at the marital residence in the afternoon, but leave when Husband arrived. Wife stated she slept at the marital residence several nights a week during this time period. On the occasions when she slept away from home, she stayed overnight with her sister or father. Wife's father is a pastor, and by the time of trial, Wife had been residing for approximately two years in a home owned by the church where he ministered.

Wife was first treated for depression in 1999. Her depression escalated in 2002, deepening further after her mother died in 2003. She testified that she removed herself from Husband's presence as much as possible in an effort to avoid exposure to Husband's physical abuse, verbal abuse, and infidelity. According to Wife, she became "reclusive," started "getting really depressed," and "went downhill from there." Wife maintained at trial that she felt paranoid often, cried easily, slept very little, and took her psychiatric medication at regular intervals. As she experienced difficulty in crowded public places, her father, sister, or son usually grocery shopped for her.

Wife's psychiatrist, Dr. Kevin R. Ferguson, testified by deposition on April 18, 2012, stating that Wife has been diagnosed with "major depression" and "psychotic features." Wife was hospitalized in January 2012 with acute symptoms of "major depression, recurrent with psychosis." For her condition, Wife was prescribed and taking Wellbutrin and Topamax for depression, Risperdal as an anti-psychotic, Haldol for sleep, and Adderall for mild attention deficit disorder. When questioned regarding the potential for Wife to maintain employment, Dr. Ferguson opined that Wife was incapable of obtaining or holding employment due to her psychological condition. While he believed Wife would benefit from counseling, Dr. Ferguson further opined that Wife's condition had progressed to the extent that she would probably not be able to maintain employment in the foreseeable future.

-4-

Concerning Jake's care as a child, it was undisputed that Wife was his primary caregiver prior to 2002. During this time frame, Wife proved also to be the primary caregiver for her son, John, all while helping Husband care for Husband's son, Steve, Jr., during visitation periods. Wife stated that when she began spending time away from the residence, she would retrieve Jake from school and devote the afternoons to him at the residence. By her account, Wife cleaned the house at the same time, so that she could either leave or seclude herself from Husband's presence once Husband came home. Husband claimed to have been Jake's primary caregiver after 2002.

Jake testified that he maintained a good relationship with both parents. He said that during the years his mother was transporting him home from school and staying with him until his father arrived, she would spend time with him and often clean the house in the afternoons. He acknowledged that his father became his primary caregiver in those years and that, beginning in the second grade, his father obtained tutoring for him. Jake stated that his mother was not comfortable in the presence of his father and would usually leave the house when his father came home or remain in a separate area of the home. At the time of trial, Jake was enrolled in college and had recently moved into the church-owned residence to live with his mother.

Wife's son, John, also testified. He explained that although the parties enjoyed a good, loving relationship during the early years of the marriage, the environment changed about the time Jake was born and the practice was moved into its current location. He stated that while Husband became more focused on work, he would be short-tempered with the family. He stated that Husband's actions were unpredictable. Routinely Husband would throw the family's cat off the back deck and at other times kick the family's dog. John began noticing bruises and other markings on Wife at that time. When John moved from the marital residence in early 2004, he observed that Wife had stopped sleeping regularly at the marital residence and sometimes stayed with her sister. He also remembered Wife regularly picking up Jake from school after she no longer stayed at the house. He recalled Wife continuing to clean the house at that time. During his testimony, he remembered many of the parties' arguments between 1998 and 2004 focusing on S.W.. He stated that Wife became depressed contemporaneously with the time he noticed the bruising. As he related, her mental state had never improved. John sought professional care for Wife at a mental health facility in January 2012.

Wife filed a complaint for divorce on June 8, 2011, alleging irreconcilable differences and inappropriate marital conduct. On June 23, 2011, Husband responded by filing an answer and counter-complaint, alleging adultery and abandonment of the marriage. Following a bench trial on April 19, 2012, and May 18, 2012, the trial court entered an order on July 16, 2012, dividing the parties' assets and awarding Wife alimony *in futuro*.

Countervailing post-trial motions were filed as both parties moved to alter or amend the judgment. Husband also moved for a new trial. The parties subsequently submitted a proposed agreed order, which was approved and entered by the trial court on September 18, 2012. The decree granted Wife a divorce on the ground of inappropriate marital conduct and resolved certain issues not relevant to this appeal. The trial court subsequently entered an additional order on September 24, 2012, clarifying the initial order, addressing the valuation of Husband's practice, realigning the division of assets, denying relief on all other issues raised by the countervailing motions to alter or amend, and denying Husband's motion for a new trial.

On October 30, 2012, Husband filed a motion seeking relief pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure. Husband specifically pled, *inter alia*, that his counsel's office had not received a copy of the September 24 order and was unaware that it was entered until October 29, 2012. Husband filed an amended Rule 60.02 motion on November 7, 2012. On November 29, 2012, the trial court granted the Rule 60.02 motion and entered an amended final judgment, clarifying matters not relevant to this appeal and allowing Husband to file a timely notice of appeal.

## II. Issues Presented

Husband presents seven issues on appeal, which we restate as follows:

1.      Whether the trial court erred by finding that Wife's expert witness was an expert evaluator of a professional practice.

2.      Whether the trial court erred by including goodwill in its valuation of Husband's professional practice and thereby assigning too great a value to the practice.

3.      Whether the trial court erred by failing to divide the marital assets in an equitable manner.

4.      Whether the trial court erred by awarding an amount of alimony *in futuro* to Wife that is beyond Husband's ability to pay.

5.      Whether the trial court erred by failing to properly weigh the respective fault of the parties when dividing assets and awarding alimony.

6.      Whether the trial court's findings of fact were contrary to the evidence presented at trial.

7.      Whether the trial court erred by awarding attorney's fees in favor of Wife.

Wife presents two additional issues, which we restate as follows:

8.      As a threshold matter, whether the trial court erred by granting Husband's Tennessee Rule of Civil Procedure 60.02 motion after the time had elapsed to file a notice of appeal.

9.      Whether this Court should award Wife her attorney's fees on appeal.

## III.  Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has elucidated the applicable standard of appellate review as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996).  As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary.  Tenn R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991).  Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).  The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007).  Questions relating to the classification of assets as marital or separate are questions of fact.  *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Further, as this Court has previously held:

> Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. §36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and §36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140 at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted) (emphasis in original). *See also Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

Determinations regarding spousal and child support are reviewed under an abuse of discretion standard. *See Mayfield v. Mayfield*, 395 S.W.3d 108, 114-15 (Tenn. 2012); *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). "This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

## IV. Tennessee Rule of Civil Procedure Rule 60.02 Motion

As a threshold matter, we consider first whether this Court has jurisdiction to entertain this appeal in light of the alleged untimely filing of the notice of appeal. Wife contends that the trial court erred in granting Husband's motion, filed pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure, for relief from the judgment entered on September 24, 2012. Wife asserts that even assuming, *arguendo*, that Husband's counsel did not receive the order via mail, he was still under an affirmative duty to contact the court clerk's office to ensure that an order had not been entered. Wife also asserts that she was prejudiced by entry of the amended final judgment on November 29, 2012, in that she would not have been required to defend the appeal but for the trial court's grant of Husband's Rule 60.02 motion. We conclude that the trial court properly considered and granted Husband's Rule 60.02 motion.

Husband filed his Rule 60.02 motion on October 30, 2012, six days after the deadline for filing a timely notice of appeal pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. Acknowledging the trial court clerk's certificate of service as proof that a copy of the Order was mailed to Husband's counsel, Husband nonetheless asserted in his motion that his counsel's office had not received a copy of the final order. By supporting affidavit, Husband's counsel stated that he learned of the order's entry during a casual conversation with Wife's counsel while both were at court on October 29, 2012. Husband filed his Rule 60.02 motion the next day, supported by affidavits from his counsel and his counsel's staff, explaining the procedure for opening and logging mail in the law office and making oath that no final order had been received there by mail. Husband's counsel also attached affidavits from the Bradley County Clerk and Master, as well as a deputy clerk, in which both officials explained that they had recently experienced difficulties with non-receipt of some outgoing mail due to the United States Post Office's rerouting of Bradley County mail through Chattanooga and back to Cleveland, Tennessee.

Rule 4(a) of the Tennessee Rules of Appellate Procedure states, *inter alia*, that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from . . . ." This time limitation is jurisdictional and mandatory in civil cases. *See Albert v. Frye,* 145 S.W.3d 526, 528 (Tenn. 2004)*; First Nat'l Bank of Polk County v. Goss*, 912 S.W.2d 147, 148 (Tenn. Ct. App. 2005); *Jefferson v. Pneumo Servs. Corp*., 699 S.W.2d 181, 184 (Tenn. Ct. App. 1985); *see also In re Joeda J.*, 300 S.W.3d 710, 711 (Tenn. Ct. App. 2009). This Court has no authority to expand or waive the thirty-day time limitation. *See* Tenn. R. App. P. 2; *see also First Nat'l Bank*, 912 S.W.2d at 148; *Jefferson*, 699 S.W.2d at 184.

The sole relief that can be granted to a party who files an untimely notice of appeal must come from the trial court, pursuant to Tennessee Rule of Civil Procedure 60. *First Nat'l Bank*, 912 S.W.2d at 148; *Jefferson*, 699 S.W.2d at 184. This relief is generally granted, however, in only the most "extraordinary" circumstances. *Id.* Ignorance or mistaken understanding of court rules, a lawyer's busy schedule, and delays caused by mailing have been ruled insufficient for the purposes of granting Rule 60 relief. *First Nat'l Bank*, 912 S.W.2d at 149; *Kilby v. Sivley*, 745 S.W.2d 284, 287 (Tenn. Ct. App. 1987); *Jefferson*, 699 S.W.2d at 184. This Court has found an extraordinary circumstance warranting relief, however, when a trial court clerk failed to timely mail copies of the signed and filed order to the parties. *See Muesing v. Ferdowski*, No. 01A019005CV00156, 1991 WL 20403 at *2 (Tenn. Ct. App. Feb. 21, 1991). "Parties seeking relief pursuant to Tenn. R. Civ. P. 60.02 have the burden of demonstrating that they are entitled to relief." *Jefferson*, 699 S.W.2d at 186.

In ruling that Husband met his burden of demonstrating that he was entitled to relief under Rule 60.02, the trial court made the following specific findings of fact and conclusions of law in pertinent part:

(a)  The rebuttable presumption has been overcome by the Affidavit of Defendant's attorney, Affidavit of attorney's staff, Affidavit of the Defendant, and the Affidavit of the Clerk & Master.

(b)  The assertions in the Affidavit are not refuted and therefore there is excusable neglect.

(c)  There is no prejudice to the Plaintiff by granting the motion.

(d)  There was no neglect by the Defendant's attorney.  The law firm of Logan-Thompson has a reputation in this community, such that, the Court believes the assertions that the Order was not received and therefore actual notice was not accomplished.

(e)  It is not unreasonable to rely on the mail.

(f)  The lack of notice constitutes excusable neglect making it appropriate and just to set aside the entry of the order.

Having reviewed the record and evidence in this cause, we agree with the trial court on this issue.  Although it is undisputed that the trial court clerk mailed the order to Husband's counsel, affidavits from the clerk and master and the deputy clerk raise sufficient question regarding whether outgoing mail from the court clerk's office was reliably reaching its destination at the time the order at issue was sent.  Moreover, affidavits from Husband's counsel, his paralegal, and assistant describe a reliable system of opening, scanning, and sorting mail that included reading mail within twenty-four hours of receipt, cross-checking among staff members within the office, sending copies of orders to clients immediately as a matter of course, and filing mail both electronically and in hard-copy form.  Husband attested as well that he had consistently received copies of orders throughout the course of this case but did not learn of the order at issue until his counsel notified him on the day counsel purported to have learned of the order himself, October 29, 2012.  We also note that Husband's counsel attempted to rectify the situation immediately upon purportedly learning of the order's entry, submitting the Rule 60.02 motion and accompanying affidavits the next day.

Although Wife is correct that Husband's counsel could have contacted the trial court clerk's office to inquire as to the entry of the order, we agree with the trial court that it was not unreasonable for counsel to rely on the court clerk to timely send the entered order to him through the mail.  *See* Tenn. R. Civ. P. 58(3) ("When requested by counsel or pro se parties, the clerk shall forthwith mail or deliver a copy of the entered judgment to all parties or counsel.  If the clerk fails to forthwith mail or deliver, a party prejudiced by that failure may

-10-

seek relief under Rule 60."). As for claimed prejudice to Wife, we determine that, based on Husband's immediate response to learning of the September 24, 2012 order's entry, Wife's necessity of defending the appeal would have arisen in any case had Husband's counsel received the order from the trial court clerk in a timely fashion. We therefore agree with the trial court that Wife was not prejudiced by re-entry of the judgment and conclude that the trial court properly granted Husband's Rule 60.02 motion for relief.

## V. Expert Witness

Husband contends that the trial court erred by finding Corinne Henderson, Certified Public Accountant and Certified Evaluation Analyst, to be an expert business evaluator. Wife contends that Ms. Henderson was qualified to value a dental practice and that her qualifications fall under the "specialized knowledge" description provided in Rule 702 of the Tennessee Rules of Evidence. We conclude that the trial court properly considered Ms. Henderson as an expert witness regarding valuation of Husband's professional practice.

Prior to trial, Husband filed a motion *in limine*, requesting that the trial court "[limit] the proof at trial to expert testimony that holds to the well settled law in the State of Tennessee with regard to the valuation of dental practices" and averring that Ms. Henderson's valuation had incorporated an approach that included Husband's goodwill as a practitioner. Wife filed a response to this motion, stating that Ms. Henderson, in valuing Husband's practice, had properly used the "Market Approach – Guidelines Transaction Method" and had not taken into account the goodwill of the practice. On April 10, 2012, ten days before trial, the trial court entered an agreed order, stating that it would hear all proof, including that of expert witness Henderson, at the trial, with Husband's motion *in limine* also to be addressed on that date.

In its order entered July 23, 2012, the trial court found that Ms. Henderson was a "financial expert" who had been licensed as a Certified Public Accountant for eighteen years and as a Certified Evaluation Analyst for eleven years at the time of trial. The trial court explicitly found that Ms. Henderson's valuation was more credible than Husband's proffered valuation, presented without expert testimony. The trial court therefore implicitly denied Husband's motion *in limine* to limit Ms. Henderson's testimony.

According to Ms. Henderson's testimony and qualifications attached to her written report, she had valued other professional practices, including medical practices, in the past. She acknowledged, however, that Husband's practice was the first dental practice she had valued. She stated that she had testified previously in court as an expert in business valuation in "less than a dozen" other cases. Her qualifications include a bachelor's degree in economics and a master of business administration degree in finance. Ms. Henderson is a

-11-

principal in Henderson & Gouger, PLLC, an accounting and financial advisory firm she established in 2005.

Rule 702 of the Tennessee Rules of Evidence provides:

> **Testimony by experts.** – If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

"Trial courts act as gatekeepers when it comes to the admissibility of expert testimony." *State v. Scott*, 275 S.W.3d 395, 401 (Tenn. 2009). "In general, questions regarding the admissibility, qualifications, relevance, and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 264 (Tenn. 1997). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404.

Husband argues that the trial court should have discounted Ms. Henderson's testimony because she failed to demonstrate that her methodology satisfied the factors to be considered when a trial court determines admissibility of scientific evidence delineated by our Supreme Court in *McDaniel*. In *McDaniel*, the Court identified five nonexclusive factors for consideration in determining the reliability of scientific expert testimony:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.2d at 264.

Regarding nonscientific expert testimony, as in the case at bar, our Supreme Court has held that a trial court may consider the following non-definitive factors when determining reliability:

(1) the *McDaniel* factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject at issue; and (3) the straightforward connection between the expert's knowledge and the basis for the opinion such that no "analytical gap" exists between the data and the opinion offered.

*See State v. Stevens*, 78 S.W.3d 817, 835 (Tenn. 2002).

Upon our review of the record, we determine that the trial court did not err in finding Ms. Henderson qualified by knowledge, skill, experience, and education to offer an opinion on business valuation that would substantially assist the court as the trier of fact. Moreover, Ms. Henderson explained her methodology, both in her written report and in testimony, and valued Husband's practice using that methodology applied to the data obtained from Husband's practice. Once the court considered Ms. Henderson's testimony, it was not obligated to adopt her opinion and instead could weigh Ms. Henderson's approach against that proposed by Husband. *See Thurman v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001) ("Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony."). Evident from the trial court's order is that it found Ms. Henderson's testimony to be of substantial assistance in determining the value of Husband's dental practice. *See* Tenn. R. Evid. 702. We discern no abuse of discretion in the trial court's consideration of Ms. Henderson's testimony as that of a qualified expert in relation to business valuation.

## VI. Valuation of Professional Practice

Husband further contends that the trial court erred by adopting Ms. Henderson's valuation of the dental practice, arguing that the valuation (1) was erroneously based on a guidelines transaction method that considered the professional goodwill of Husband's practice and (2) did not take the debts owed by the practice into consideration. Wife contends that the trial court properly adopted the expert's valuation of Husband's practice. We agree with Husband that Ms. Henderson did erroneously consider the goodwill of Husband's practice in reaching a valuation for marital property division and that the trial court erred in adopting this aspect of Ms. Henderson's valuation.

As this Court has previously explained:

The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with

-13-

regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.

The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present. Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

*Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (internal citations omitted).

Wife acknowledges on appeal that it is well settled under Tennessee law that professional goodwill is not a marital asset that can be divided in a divorce proceeding. *See Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985). As this Court has recently explained:

The basic rationale . . . in the cases disallowing goodwill as a component of the estate in valuing a professional practice results from the inequity in compelling a professional practitioner to pay a spouse a share of an intangible asset at a judicially determined value that could not be realized by a sale or another method of liquidating value.

*Eberting v. Eberting*, No. E2010-02471-COA-R3-CV, 2012 WL 605512 (Tenn. Ct. App. Feb. 27, 2012) (citing *Smith*, 709 S.W.2d at 591-92).

In its original Order dividing the parties' assets, the trial court adopted Ms. Henderson's valuation of the dental practice at $468,000.00, subtracted debt owed by the practice in the amount of $165,720.00, and assigned a net value to the practice of $302,280.00. In its subsequent order addressing the parties' countervailing motions to alter or amend the judgment, the trial court maintained the value it initially established for the dental practice, explaining its findings in this regard as follows:

The court will address the valuation of the dental practice of Dr. Hartline. The expert hired by the Wife in this case valued the business between $468,000 and $500,000 without counting the real property. Dr. Hartline on the other hand valued the business at a negative One Hundred Thousand (-$100,000) Dollars which excluded the real property. Dr. Hartline's approach to this was to take the business assets and subtract the business debt to arrive at his valuation of approximately a negative One Hundred Thousand (-$100,000) Dollars. The court does not find this credible.

-14-

As the expert in this case testified, this business is an ongoing concern with trained staff, and a building was built specifically for dentistry. Ms. Henderson testified she did not consider the personal good will of Dr. Hartline in valuing this business. She testified the asset approach was not standard for the industry in valuing a dental practice such as this because it does not reach true value. Ms. Henderson used a market approach in assuming a willing buyer and a willing seller with an arm's length transaction in arriving at her opinion as to the value of this business. Unlike [Eberting] v. Eberting, [2012] WL605512 (Tenn. Ct. [App. Feb. 27, 2012]), this business was not purchased by Dr. Hartline, and he did not purchase a covenant not to compete with this business. Dr. Hartline failed to value his patient charts, his accounts receivable, and the fact that this is an ongoing business, and the court does not credit his testimony that the value of this business without considering real property is a negative One Hundred Thousand (-$100,000) Dollars. Dr. Hartline employs several employees. Therefore, the court denies the Motion to Alter or Amend/Motion for New Trial on this issue.

As the trial court specifically noted, Ms. Henderson testified that she did not consider Husband's professional goodwill in her valuation of his dental practice. In reviewing her testimony, however, we must conclude that Ms. Henderson did consider goodwill as Tennessee courts have defined it. Ms. Henderson stated that the approach she chose in assessing Husband's dental practice was the one she felt, based on her training, experience, and expertise, was most appropriate to this type of business. In her written report, Ms. Henderson describes the approach used as follows:

> **Market Approach – Guideline Transaction Method:**
> The method of valuation selected to estimate the value of the company is the guideline transaction method, a market approach. Guideline transaction method calculations utilize value multiples applied to either (a) a measure of operations for a period in time or (b) a measure as of a single point in time. The measurement used to calculate the value of the company was annual clinical production. The value multiple applied to the company's annual production was derived from guideline transactions.

Ms. Henderson also described in her report the assessment methods considered but not used in her valuation, which included an "Income Approach – Capitalized Earnings Method" and an "Asset Approach – Liquidation Value." The latter is the approach Husband argues should have been used and is described in Ms. Henderson's report as follows:

**Asset Approach – Liquidation Value:**
Liquidation value is generally defined to mean the net proceeds that could be reasonably expected to be realized if the assets of a business were sold off piecemeal or in bulk, all liabilities extinguished, and all business activity terminated. Actual liquidation value, of course, can only be established by the actual sale of assets and the payment of all outstanding obligations. We have not used this method based on the assumption that the proprietor of the company is not willing or interested in liquidating the company at this time.

At trial, Ms. Henderson explained that the Guideline Transaction Method she used is a "market approach," "based on production, which is a revenue-based approach." Production for a dentist equates to how many patients he treats, and Ms. Henderson stated that she assumed all collections actually "hit the books" or became actual income. She analyzed the numbers for Husband's practice for the time period of January 1 through June 1, 2011. When questioned regarding whether she assumed Husband would continue practicing as a dentist, Ms. Henderson responded:

I'm going to say sort of because if Dr. Hartline came to me today and said, What do you think my practice is worth, I want to sell it, I'm not going to continue to practice, I would say, You should get four sixty-eight to half a million. That's what the practice, I think, would bring in the market. That's what I believe the fair market value of the practice is. So if he didn't — you know, if he sold it, then he wouldn't continue to practice.

Ms. Henderson further explained that in determining the market value if Husband were to sell his practice, she considered that the purchaser would be "buying a going concern; you're buying something that's already operating. So that's part of the value is the fact that you've got an in-place, existing, going-concern business." She agreed this included having patients in place but said that much of the attraction for those patients is that the practice is already set up in a particular location. Ms. Henderson asserted that none of her valuation depended upon Husband being the person to continue the practice.

Ms. Henderson's testimony illustrates the fine line previously noted by this Court between the personal goodwill of a practitioner and the business goodwill of a practitioner's business, complete with staff, equipment, and a location that could be assumed by another practitioner. *See Smith*, 709 S.W.2d at 592-93. In holding that goodwill of a sole practitioner should not be considered for purposes of property distribution in a divorce action, this Court has noted that the "'concept of professional good will evanesces when one attempts to distinguish it from future earning capacity.'" (*Id.* at 591) (quoting *Holbrook v. Holbrook*, 309 MN.W.2d 343 (Wis. Ct. App. 1981)).

Ms. Henderson was clearly distinguishing between Husband's personal goodwill in the community and the goodwill his practice would continue to enjoy with a different practitioner in terms of equipment, staff, location, and established patients. This Court has previously determined that such a distinction may be considered in including business goodwill for valuation where the practitioner has one or more partners or pre-established contracts that could be assumed by another practitioner. *See, e.g. York v. York*, No. 01-A-01-9104-CV00131, 1992 WL 181710 (Tenn. Ct. App. July 31, 1992) (concluding that as opposed to cases such as *Smith*, in which "the professional practice's value as a going concern and its business reputation were inseparable from the professional reputation of the practitioners," "'net asset value' principles do not apply to incorporated professional practices that do not depend solely on the professional reputation of the practitioner."). However, in a case such as the one at bar, wherein Husband is the sole practitioner of an unincorporated dental practice, whether his business could continue without him is speculative, leading to the conclusion that the goodwill of Husband's practice should not be considered in valuing said practice. *See Smith*, 709 S.W.2d at 592. We therefore must reverse the trial court's valuation of Husband's dental practice and remand for valuation without consideration of goodwill, regardless of whether that goodwill is associated personally with Husband or with his practice.

On remand, the parties should be allowed to present additional evidence regarding the value of the dental practice. *See Wilkerson v. Wilkerson*, No. W1999-01684-COA-R3-CV, 2000 WL 633462 at *2-3 (Tenn. Ct. App. May 11, 2000) (affirming the trial court's consideration of additional proof regarding the value and distribution of marital assets on remand from this Court) (quoting *First Tenn. Bank Nat'l Assoc. v. Hurd Lock and Mfg. Co.*, 816 S.W.2d 38, 40 (Tenn. Ct. App. 1991) ("'[T]his court, in its original opinion, envisioned and intended that the trial judge, on remand, take all action necessary to do complete justice, including the reception of additional proof.'")). We note also that the trial court did not rely solely upon Ms. Henderson's valuation and that the remaining facts the court considered are supported by the record and should be included on remand in the court's valuation of the dental practice.

For example, Ms. Henderson testified that she did not consider the debt owed by the dental practice because debt is not included in a market-based approach. The trial court, however, did subtract the practice's debt of $165,720.00 from its total valuation, a consideration appropriate in light of the asset-based approach adopted by Tennessee courts in valuing a sole practitioner's business. *See, e.g., Burton v. Mooneyham*, No. M2011-00909-COA-R3-CV at *3-4 (Tenn. Ct. App. Mar. 28, 2012) (approving an expert witness's asset-based valuation of the husband's business with a tax lien on the business subtracted from the value of assets). The trial court also considered the testimony of Husband's longtime office manager, Michelle Partap, who had prepared an aging report for the practice

prior to trial. Ms. Partap testified as to the high percentage of accounts receivable historically collected by the practice (99.9% in 2011) and to an accounts receivable amount for current accounts under thirty (30) days old of $43,638.77. *See Smith*, 709 S.W.2d at 592 (including accounts receivable in asset-based approach to valuing sole practitioner's business). As this Court noted in *Eberting*, the trial court may consider all evidence relevant to valuation of a business, and the "trial judge, as the fact finder, is not required to check his or her common sense at the door when considering evidence." *See* 2012 WL 605512 at *19.

## VII. Equitable Division of Marital Assets

Husband next contends that the trial court erred by dividing the marital property inequitably and allocating all marital debts to Husband. Although we conclude that the trial court's overall division of assets was essentially equitable, for the reasons delineated in the previous section, we remand for adjustment of the equitable division of assets following the trial court's revaluation of the dental practice, on remand, without consideration of goodwill.

Prior to trial, the parties stipulated to a value of $185,000.00 for the marital residence and $345,000.00 for the real property on which the dental practice is located. They also agreed to an equitable division of personal property. Following trial, the trial court found in its July 23, 2012 order that "[n]either party has significant separate assets." The court therefore properly considered all of the parties' assets as marital property to be equitably divided. *See McHugh*, 2010 WL 1526140 at *3-4. The marital property was divided as follows according to the September 24, 2012 order, incorporating the prior July 2012 order:

| Property | Valued by Court | Party Awarded |
|---|---|---|
| marital residence | $185,000.00 | To be sold with $23,107.90 to Wife to match total of amounts in money market account and checking account; then remaining equity split |
| real property, dental practice location | $345,000.00 | Husband, with Wife awarded $175,000 lien, to be paid in 45 days |
| dental practice | $468,000.00 | Husband |
| Edward Jones money | $6,484.80 | Husband |

| | | |
|---|---|---|
| market account | | |
| Individual Retirement Account ("IRA") | $330,157.34 | Split equally |
| checking account | $16,627.10 | Husband |
| Mony life insurance policy | $27,073.00 | Wife |
| Northwestern Mutual policy | $90,927.00 | Wife |
| Americafund | $8,782.51 | Split equally |

By the order entered September 24, 2012, the trial court stated that it valued the total net assets of the marital estate at $1,166,350.00 and found the total debt owed by the parties to be $302,918.00. The total net value stated in the order was deficient in an amount equal to the balance of an Americafund account, $8,782.51, which holding was noted on an attachment to the original order, incorporated into the September 24 order, as one of the assets to be equally split. The total net value of the marital estate, as valued by the trial court, was therefore approximately $1,175,132.95. The court assigned the obligation of all marital debts to Husband, stating in its order that the total net assets awarded to Husband were valued at $615,474.07, or 52% of the marital estate.[1]

As recognized above, "[t]his Court gives great weight to the decisions of the trial court in dividing marital assets and 'we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *Keyt*, 244 S.W.3d at 327 (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). This Court has also previously elucidated:

---

[1]The above chart of assets is based largely on a chart included by Wife as an appendix in her brief, and upon our review of the record, we find that this chart tracks the individual asset awards of the trial court's order and matches the total amount of assets found and division ordered by the trial court. The court did not include percentages in its order. The percentage we have calculated is based on the court's order and differs both from the 56% of net assets to Husband calculated by Wife in her brief on appeal and the 46% of net assets to Husband calculated by Husband in his brief on appeal. Husband's calculation of his net assets appears to be artificially low due to a double subtraction of debts associated with Husband's dental practice.

-19-

The approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c) in light of the evidence that the parties have presented. Trial courts have broad discretion in fashioning an equitable division of marital property, and appellate courts must accord great weight to a trial court's division of marital property. Accordingly, it is not our role to tweak the manner in which a trial court has divided the marital property. Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable.

*Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007) (internal citations omitted).

Tennessee Code Annotated § 36-4-121(c) (Supp. 2013) provides the following factors as guidance for determining an equitable division of marital property:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (Supp. 2012).

As this Court has explained:

The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner. The division of the estate is not rendered inequitable simply because it is not mathematically equal, or because each party did not receive a share of every item of marital property. In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its final results.

*Payne v. Payne*, No. E2006-02467-COA-R3-CV, 2007 WL 2668588 at *4 (Tenn. Ct. App. Sep. 12, 2007) (internal citations omitted).

In addition to arguing that the dental practice was assigned an inflated value, Husband argues that the trial court erred by (1) assigning too much significance to Wife's contributions to the marriage and (2) inequitably allocating all marital debts to Husband. We will address each of these remaining arguments in turn.

Husband asserts in his brief on appeal that "[i]t is undisputed that the Wife's contribution to the marriage stopped in 2002 . . . ." Considering the evidence presented, we do not find this assertion to be undisputed. Wife argues that the trial court properly considered her contributions throughout the marriage, including that she continued to care for the parties' son after school and clean the house even after she began spending some

-21-

nights away from the marital home. Wife testified that she routinely retrieved Jake from school in the afternoons during these years, caring for him at the marital residence until Husband returned home from his work at the dental office. As previously referenced, Jake corroborated this testimony, explaining that his mother often cleaned the house while she was present. Jake acknowledged that his mother was not his primary caretaker during these years but added that she helped him with school projects, contributed to his care, and maintained a good relationship with him. Wife's son, John, supported this testimony regarding the relationship between Wife and Jake.

In addition to crediting the above testimony regarding Wife's contributions in caring for the marital residence and for Jake after 2002, the trial court determined that Wife was Jake's primary caretaker before that time and that Wife helped Husband care for his son, Steve, Jr., during visitation periods in the early years of the marriage. The trial court, in its July 2012 order, further made the following specific findings of fact regarding Wife's contributions to the marriage, use of funds, and related statutory factors:

> Dr. Hartline argues that his wife contributed nothing to the marriage after 2003. It is further his position that she depreciated the marital estate by cashing Eleven Thousand ($11,000) Dollars of an IRA and charging Twenty Four Thousand ($24,000) Dollars in credit card debt.
> Mrs. Hartline is a fifty-one (51) year old female who will be able to draw social security at age sixty-two based on Dr. Hartline's work history. It is his position that Mrs. Hartline failed to treat her depression and because of this and her affair, she is at fault in this marriage and should, therefore, receive thirty (30%) percent of the marital assets.
> Mrs. Hartline's mental health deteriorated further when her mother died in 2003. Because of the physical abuse and the bruises left by Dr. Hartline, she became more and more reclusive. Because of what she felt like was an inappropriate relationship between Dr. Hartline and his hygienist, she felt the environment at the office was too hostile for her to continue to work there. Mrs. Hartline asserts Dr. Hartline failed to give her money to take care of herself so she had to receive help from her father and sisters. She went from being a good dental assistant and an asset to the practice to now taking medication for seizures, depression, anti-psychotic medication, [Adderall] for ADD, and Halcion to help her sleep. She suffers from various phobias, cannot focus, and cannot pass a drug test because of her medication.
>
> . . .

Between 2000 and 2010, Dr. Hartline testified he paid his wife approximately $300 per week. A review of Exhibit 26 shows that he actually paid her Twelve Thousand ($12,000+-) Dollars in the last three years and most of which came after he was ordered to do so by this court, exclusive of car payments, medical insurance, and IRA payments.

While Dr. Hartline insists that Mrs. Hartline is not entitled to any assets that accrued in this marriage after 2003, that is not the law. The parties have been married for twenty-six (26) years. Wife worked in the Husband's practice and was instrumental in it until approximately 2003.

In testifying about the IRA and Edward Jones accounts, Dr. Hartline's testimony was further impeached. Dr. Hartline was basically in control of all the monies in the parties' relationship. By limiting her access to funds, he attempted to financially starve her in the marriage.

. . .

Wife has very little ability to acquire future capital or income. There is no proof that she depreciated any of the marital assets except the $11,000 IRA. There is no proof concerning the tax consequences to each party in the division of the assets in this case. Each of the parties will have certain social security benefits available to them in the future.

Upon our thorough review of the record, we determine that the trial court's factual findings are supported by a preponderance of the evidence. We further determine that in addition to other statutory factors, the trial court properly considered Wife's contributions to the marriage, both before and after 2003, as well as her expenditure of funds in order to have money on which to live in the more recent years of the marriage. We conclude that the evidence does not preponderate against the trial court's findings in this regard or against the trial court's findings relative to other statutory factors, including the duration of the marriage; age, physical and mental health, and employability of the parties; potential for each party to acquire financial gains in the future; present economic circumstances of each party; and social security benefits.[2] *See* Tenn. Code Ann. § 36-4-121(c).

Husband further argues that the trial court erred in assigning all marital debt to him. Our Supreme Court has held that the following factors should be considered by the trial court in properly allocating marital debt:

---

[2]As the trial court explained, the proof evinced that Husband did not contribute to Wife's social security earnings when she was in his employ but that she would be entitled to some social security earnings based on previous employment and through Husband's earnings.

(1)     the debt's purpose;

(2)     which party incurred the debt;

(3)     which party benefitted from incurring the debt; and

(4)     which party is best able to repay the debt.

*Alford v. Alford*, 120 S.W.3d 810, 814 (Tenn. 2003). Wife argues that because the majority of the debts were associated with the dental practice and inasmuch as Husband is the party with the means by which to earn income, the trial court properly allocated the debt obligations to him. We agree.

The trial court found that Wife had been living in significant part on the generosity of her family, staying in her father's church-owned house and relying often on her father or sisters to help her purchase groceries and other necessities. As the trial court noted and Wife testified, while she liquidated and closed the IRA in her name, to which Husband had contributed, she was in need of those funds to pay her ordinary living expenses. Husband testified that he stopped depositing money into Wife's IRA when he realized she was withdrawing funds from it. He acknowledged that the IRA in his name contained over $200,000.00 at the time Wife's account contained approximately $11,000.00. According to Dr. Ferguson, Wife currently is not employable, nor shall she be in the foreseeable future. Wife has no means by which to pay marital debt. We conclude that the trial court did not err in allocating and assigning repayment of all marital debts to Husband. Having concluded that the preponderance of the evidence supports the trial court's equitable division of marital assets, we remand on this issue solely for an appropriate adjustment of the division of assets based on the trial court's revaluation of the dental practice without consideration of goodwill. We further conclude that the percentages calculated and established based on the trial court's order support such equitable division of assets.

## VIII.  Alimony *in Futuro*

Husband contends that the trial court erred in awarding $3,800.00 monthly in alimony *in futuro* to Wife, plus health insurance costs in the amount of approximately $500 monthly.[3] Husband argues that he does not have the present ability to pay this combined amount. In support, Husband asserts that the alimony award was based on an inflated expense statement from Wife, an inflated monthly cash flow estimate for his dental practice, and the trial court's failure to adequately consider his debt obligations. Wife contends that the trial court appropriately considered the factors enumerated in Tennessee Code Annotated § 36-5-121(i)

---

[3]The trial court ordered Husband to continue paying Wife's health insurance costs and did not specify the amount of those costs. Husband presented documentation at trial that Wife's health insurance premium at that time was $465.00 monthly.

in awarding alimony. Having carefully considered the evidence in this cause, we agree with Wife on this issue.

Tennessee law recognizes four types of spousal support: (1) alimony *in futuro*, also known as periodic alimony; (2) alimony *in solido*, also known as lump-sum alimony; (3) rehabilitative alimony; and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d) (Supp. 2013); *Mayfield*, 395 S.W.3d at 115. Our statutory scheme indicates a legislative preference favoring the short-term forms of spousal support, rehabilitative and transitional alimony, over the long-term types of support, alimony *in futuro* and alimony *in solido*. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Mayfield*, 395 S.W.3d at 115; *Riggs v. Riggs*, 250 S.W.3d 453, 456 (Tenn. Ct. App. 2007). Alimony *in futuro*, at issue in the case at bar, may be appropriate, however, when rehabilitation of the economically disadvantaged spouse is not feasible. *See* Tenn. Code Ann. § 36-5-121(d)(4). Tennessee Code Annotated § 36-5-121(f)(1) further provides:

> Alimony in futuro, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient. Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

It is well settled that "trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award." *Id.* at 114; *see also Fickle v. Fickle*, 287 S.W.3d 723, 736 (Tenn. Ct. App. 2008). Tennessee Code Annotated § 36-5-121(i) (Supp. 2013) provides that when determining the nature and amount of an alimony award, the trial court should consider all relevant factors, including:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the

necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

"Although each of these factors must be considered when relevant to the parties' circumstances, 'the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs*, 250 S.W.3d at 457).

In regard to alimony, the trial court in the instant action made the following factual findings in its July 23, 2012 order in pertinent part:

-26-

Dr. Hartline claimed monthly expenses in the amount of $7,934 and monthly income in the amount of $7,863. However, the court finds his true monthly income is $12,777. Part of Dr. [Hartline's] claimed expenses are his payments toward his own retirement, his family YMCA membership, and certain expenses for Jake. Expenses he claims for groceries are for both he and Jake and appear to be exaggerated. Jake no longer lives with him. Further, Dr. Hartline proposes to tithe and make gifts to others far above what he has given Mrs. Hartline. She has a need in the amount of $3,800 per month without considering any future auto expense. She also needs health insurance. Husband has an ability to pay insurance and alimony.

Considering the relative earning capacity, obligations, needs and financial resources of each party, Wife has a need for alimony in this case. Dr. Hartline has an ability to pay alimony. He is more educated and has much more training than Mrs. Hartline. Based on her current psychological condition, she is unable to work and support herself. She is fifty-one (51) years old. The parties have been married for more than twenty-five (25) years. Neither party has significant separate assets. The parties have established a standard of living during the marriage. The Court finds that the Wife should have not been in the situation where she was not able to obtain adequate treatment. Because of her psychological condition and because Dr. Hartline had control of all the assets of the parties, she was unable to leave or get the much needed psychiatric/medical treatment. Mrs. Hartline helped him build his dental practice, worked in the home, and cared for their child until she was forced to avoid contact with Dr. Hartline because of his physical and emotional abuse.

The court has further considered the relative fault of these parties in this case. The court finds that the relationship between [G.C.] and Mrs. Hartline was inappropriate; however, her **relative** fault is less than that attributable to Dr. Hartline. His was the precipitating factor in the breakdown of the parties' relationship. The court finds that this is not a case for rehabilitative alimony. Wife will not be able to achieve an income that can support the standard of living enjoyed during the marriage. Further, in light of her current medical issues, the court finds that long term support will be necessary. According to the testimony of Dr. Ferguson, Wife's mental health has been compromised, and she continues to suffer from major depression and borderline personality disorder.

Wife has very little ability to acquire future capital or income. There is no proof that she depreciated any of the marital assets except the $11,000 IRA. There is no proof concerning the tax consequences to each party in the

division of the assets in this case. Each of the parties will have certain social security benefits available to them in the future.

Based on the above findings, the court finds that Wife should receive alimony in futuro in the amount of Three Thousand Eight Hundred ($3,800) Dollars per month.

(Emphasis in original.)

In its September 24, 2012 order addressing the parties' motions to alter or amend the judgment, the trial court further explained its findings regarding the award of alimony *in futuro*:

As to the issue of alimony, Dr. Hartline testified that he had reduced his business expenses. His bookkeeper, Ms. Hamby, testified that Dr. Hartline's Affidavit of Income provided to this court was prepared using his tax return and did not include depreciation. Subsequently, she offered testimony that his total "spendable" income was $12,777 per month.[4] When the court looks at what Dr. Hartline claimed as his income and adds back the depreciation, as well as considered his retirement contributions, his life insurance premiums that he will no longer be paying, some expenses that he pays for the parties' adult son which are not mandated by the court, and his Sixteen Thousand ($16,000+) Dollar plus yearly payments for charity, the court finds his income gives him an ability to pay alimony.

In addition, the court finds that Dr. Hartline's monthly expenses are exaggerated. In his Affidavit of Monthly Income and Expenses, Dr. Hartline listed $750 per month in tithing but claimed during trial that he was giving Sixteen Thousand ($16,000+) Dollars plus to charity on a yearly basis. When the court further considers his contributions and gifts, as well as his exaggerated expenses on groceries, clothing replacement, cleaning supplies, schooling for Jake, $150 per month in haircuts and shampoo for himself and Jake, $355 a month for vehicle maintenance for himself and Jake, as well as the life insurance that he will no longer be paying, the court finds his monthly expenses are more reasonably in line with $4,500 per month. Also, Dr.

---

[4]The record shows Ms. Hamby's testimony as stating that Husband's spendable income for 2011 was $12,707.75 per month in 2011, rather than $12,777.00. Husband has not raised this apparent typographical error on appeal, and we find that as Ms. Hamby's testimony was one of several factors the court considered in setting the amount of Husband's income and of the alimony awarded to Wife, this error does not affect our analysis. *See, e.g, In re Caleb L.C.*, 362 S.W.3d 581, 598 (Tenn. Ct. App. 2011) (finding that typographical errors noted in the trial court's detailed judgment did not affect the overall clarity of the judgment or this Court's analysis).

Hartline testified some of his personal monthly expenses are paid through his business account and are deducted before he receives his income. When the court set his income at $12,777 per month, the court had testimony that his income was $13,033 per month which is in line with the $16,000 per year tithe he claimed during this case. He also carries a business deduction for his own retirement and escrows his yearly tax expenses in his accounts on a monthly basis. For these reasons, the court finds the alimony for Mrs. Hartline is reasonable.

(Emphasis in original.)

We determine that the evidence supports these factual findings. Further, considering the statutory factors, we conclude that the trial court did not abuse its discretion in awarding alimony *in futuro* to Wife in the amount of $3,800.00 monthly. As noted in the previous section, Wife was fifty-one years old at the time of trial. Although Wife was educated as a dental assistant, she had been unable to work for several years due to her mental and emotional state. Her psychiatrist testified that she would not be able to hold employment in the foreseeable future. Husband, at sixty-three years old, is an experienced professional practitioner with an ongoing, substantial income source. He maintains the ability to control his contributions to his own retirement fund and to charity, as noted by the trial court. Indeed, Husband testified that he had reduced his contributions to charity in response to the trial court's order to pay temporary spousal support. The record presents no reason to question whether he could make such further adjustments as needed to pay permanent alimony. Contrary to Husband's assertion on appeal, we do not find that the trial court ignored Wife's fault in participating in an extramarital relationship with G.C. Conversely, the court appropriately exercised its discretion in considering the parties' relative fault during the extended period of time during which this marriage was disintegrating. *See* Tenn. Code Ann. § 36-5-121(i)(11).

Wife's income and expense statement presented her need for $4,475.00 per month plus health insurance. Wife testified that she was not incurring expenses such as rent or utilities while living in her father's "church house." According to Wife, she based much of her expense statement on reviewing expenses incurred by her sister, Ms. Lipscomb, and reducing those to match an individual living alone. Ms. Lipscomb corroborated this testimony, stating that Wife needed assistance in estimating expenses because of her dependence in recent years on the generosity of family members. Wife further testified that she did not feel safe or comfortable continuing to live at the church-owned home because church members also had access to it. She presented photographs of vandalism occurring at the church residence while she was staying there. Such evidence reflected disturbing and threatening epitaphs painted on the home's door. Dr. Ferguson testified that Wife's mental

and emotional state included paranoia and that her symptoms sometimes resembled symptoms of post-traumatic stress disorder. He opined that Wife "needs a place she could call her own . . . a place she had the lock and key to, that nobody else did, would probably make her feel a little more secure . . . ." The trial court's award of alimony *in futuro* at $3,800.00 monthly provides $675.00 less than Wife's stated monthly expenses. It was not unreasonable, however, for the trial court to award Wife sufficient alimony to enable her to support herself and live on her own.

In his affidavit of income and expenses, Husband claimed his net monthly income as $9,257.00. The trial court, however, found Husband's net monthly income to be $12,777.00. The court based this finding in part on Husband's bookkeeper's, Ms. Hamby's, testimony. As explained by Ms. Hamby, Husband's spendable income per month was approximately $12,707.75 but his statement of personal income was routinely reduced for equipment depreciation in the dental practice. Ms. Partap testified that in total, Husband's dental practice collected $548,577.64 in accounts receivable in 2011. The aging report she prepared for the dental practice supported this testimony. The record supports the trial court's finding that Husband has considerable discretion in the manner by which the expendable income from his practice will be spent. We conclude that the evidence preponderates in favor of the trial court's finding that Husband has the ability to pay Wife $3,800.00 monthly in alimony *in futuro*.

## IX. Consideration of Relative Fault

Husband contends that the trial court abused its discretion by failing to properly weigh Wife's fault when dividing the parties' assets and awarding alimony. Wife contends that the trial court properly weighed the relative fault of the parties regarding spousal support only. We agree with Wife on this issue.

It is well settled in Tennessee that the fault of the parties is not to be considered by the trial court in determining an equitable division of marital assets. *See* Tenn. Code Ann. § 36-5-121(a)(1), (c); *Bowman v. Bowman*, 836 S.W.2d 563, 567-68 (Tenn. Ct. App. 1991). The relative fault of the parties may be considered at the trial court's discretion, however, in determining an award of alimony. *See* Tenn. Code Ann. § 36-5-121(i)(11). We have previously determined that the trial court did not abuse its discretion in weighing the relative fault of the parties in awarding alimony *in futuro* to Wife. We further determine that there is nothing in the record to support Husband's allegation that the trial court considered the fault of either party in its division of the marital estate, as to do so would have been improper. *See Bowman*, 836 S.W.2d at 567.

## X. Sufficiency of Factual Findings

Husband asserts that the trial court's findings of fact regarding Husband's fault in contributing to the disintegration of the marriage were against the preponderance of the evidence. He essentially argues that the court erred in finding a causal relationship between Husband's treatment of Wife and her depression, withdrawal from work, and overall mental and emotional decline. Husband raised this issue in his motion for new trial. In denying Husband's motion in its September 24, 2012 order, the trial court stated in pertinent part:

> As to the Motion for New Trial based on the causation of [Wife's] inability to work, the court finds that there were many facets of this dysfunctional relationship in determining fault and alimony. The court found that Mrs. Hartline is unable to work and as such is entitled to alimony. Whether [Husband] caused or contributed to [Wife's] inability to work does not forgo a finding to entitle Mrs. Hartline to alimony. The court found previously she is unable to work and used that finding in determining alimony.

As with the previous issue, having determined that the trial court did not abuse its discretion in weighing the relative fault of the parties in awarding Wife alimony *in futuro*, we further conclude that the evidence preponderates in favor of the court's findings of fact. Husband is not entitled to relief on this issue.

## XI. Attorney's Fees at Trial

Husband contends that the trial court erred in awarding attorney's fees to Wife, positing that Wife has adequate property and income, following the court's division of marital property and award of alimony, with which to pay her attorney's fees. We disagree.

Upon review of the trial court's order, it appears that the award of attorney's fees is fundamentally an award of alimony *in solido* and that the issue should be analyzed in the same manner by this Court. *See Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996); *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992). The trial court's decision regarding attorney's fees in a divorce proceeding is within the sound discretion of the trial court and will not be disturbed upon appeal unless the evidence preponderates against it. *Storey*, 835 S.W.2d at 597. As our Supreme Court has stated:

> The trial court's determination of a reasonable attorney's fee is "a subjective judgment based on evidence and the experience of the trier of facts," and Tennessee has "no fixed mathematical rule" for determining what a reasonable fee is. Accordingly, a determination of attorney's fees is within the discretion

of the trial court and will be upheld unless the trial court abuses its discretion. We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision. The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court, and we will find an abuse of discretion only if the court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party."

*Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (internal citations omitted).

In this case, the evidence demonstrated that Wife was entitled to an award of alimony because, *inter alia*, she was the economically disadvantaged spouse with an inability to obtain or maintain employment due to her mental condition. We agree with the trial court that Wife was also entitled to an award of attorney's fees for similar reasons. In terms of the amount of attorney's fees awarded, the trial court in its July 23, 2012 order found that $20,000.00 was reasonable and awarded $20,000.00 to be paid to Wife from the sale of the home. In its subsequent order entered September 24, 2012, the trial court revisited the issue of attorney's fees and stated in relevant part:

> [Wife] is also entitled to some of her attorney's fees; however, Dr. Hartline does not have a large amount of cash to pay those. Therefore, the court awards Wife Seven Thousand Five Hundred ($7,500) Dollars toward her attorney's fees to be paid within ninety (90) days.

We note that in ordering the payment of $7,500.00, the trial court did not expressly amend its ruling that $20,000.00 was a reasonable amount for Wife's attorney's fees. In his brief on appeal, Husband argues that the trial court amended its award of attorney's fees from $20,000.00 to $7,500.00. We note that Wife maintains in her statement of facts the significance of the trial court's order that $20,000.00 in attorney's fees be deducted from the sale of the marital residence. Following our review of the trial court's orders and the record, we conclude that the trial court's adjudication of this issue requires clarification as to the $12,500.00 balance of attorney's fees awarded Wife in the July 2012 order and whether this amount should continue to be deducted from the sale of the marital residence. We therefore remand to the trial court for such clarification regarding the issue of attorney's fees at trial.

## XII.  Attorney's Fees on Appeal

Wife contends that she should be awarded her attorney's fees on appeal as an additional award of alimony.  As this Court has stated:

[I]t is in the sole discretion of this court whether to award attorney's fees on appeal.  As such, when this Court considers whether to award attorney's fees on appeal, we must be mindful of "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered."

*Parris v. Parris*, No. M2006-02068-COA-R3-CV, 2007 WL 2713723 at *13 (Tenn. Ct. App. Sept. 18, 2007) (quoting *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454 (Tenn. Ct. App. Sept. 3, 2003)) (other internal citations omitted).  Given the results of this appeal, Wife's request for attorney's fees on appeal is denied.  *See Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 411 n.2 (Tenn. 2006).

## XIII.  Conclusion

For the reasons stated above, we reverse the trial court's valuation of Husband's dental practice and remand to the trial court for (1) revaluation of the dental practice without consideration of professional goodwill, (2) adjustment of the proper allocation of marital assets based on revaluation of the dental practice, and (3) clarification of whether the September 24, 2012 order reduced the award of attorney's fees to Wife from $20,000.00 to $7,500.00 or simply directed payment of $7,500.00 of the initial award within ninety days. The trial court's judgment is affirmed in all other aspects.  Wife's request for an award of attorney's fees on appeal is denied.  Costs on appeal are assessed equally to both parties.

_____
THOMAS R. FRIERSON, II, JUDGE